FILED 18 OCT '18 15:54 USDC-ORE

In US District Court of Oregon

Todd Giffen,
Plaintiff,

V

Multnomah County Circuit Court,
Jeremy Wolff,
Mark A Peterson,
Jon J. Ghastin,
Stephen K. Bushong,
Judith H. Matarazzo,
Barbara Marcille,
Oregon Court of Appeals,
Oregon Supreme Court,
Lane County Circuit Court,
Marion County Circuit Court,
US District Court of Oregon,
US District Court of New York,
US District Court of California,
US District Court of District of Columbia,
US District 9 Court of Appeals
United States Supreme Court,
Social Security Administration,
Bronx Supreme Court,
Westchester Supreme and County Court,
Mental Hygiene Legal Service,
New York City Human Resources
Administration,
New York City Office of Temporary
Disability Assistance,
New York City Comptroller,
Federal Public Defenders in Eugene
Oregon and Portland Oregon,
Fresno Federal Public Defenders

Case no.

Motion for reasonable accommodations
under Rehab Act section 504

I am fully disabled litigant and motion the court for reasonable accommodation of
counsel at public expense under the Rehab Act section 504, which bars discrimination
against the disabled and requires the court to provide reasonable accommodations as a

receiver of federal monies. Petitioner cannot access the court, respond to motions, or make filings without counsel due to his impairments and as a protected class is being afforded unequal benefits by the courts by allowing the rich to be represented by counsel, but not he as a disabled poor man. Supporting case laws, medical documentation confirming my disability and argument are in the main petition and exhibits.

10/16/18

*Todd Giffen*

Todd Giffen
405 W Centennial BLVD
Springfield, OR 97477
5039675202
https://www.trumpsweapon.com/
case@oregonstatehospital.net

# Seattle Journal for Social Justice

Volume 2 | Issue 2                                                                                     Article 30

5-1-2004

# The ADA: One Avenue to Appointed Counsel Before a Full Civil Gideon

Lisa Brodoff

Susan McClellan

Elizabeth Anderson

Follow this and additional works at: http://digitalcommons.law.seattleu.edu/sjsj

### Recommended Citation

Brodoff, Lisa; McClellan, Susan; and Anderson, Elizabeth (2004) "The ADA: One Avenue to Appointed Counsel Before a Full Civil Gideon," *Seattle Journal for Social Justice*: Vol. 2: Iss. 2, Article 30.
Available at: http://digitalcommons.law.seattleu.edu/sjsj/vol2/iss2/30

This Article is brought to you for free and open access by the Student Publications and Programs at Seattle University School of Law Digital Commons. It has been accepted for inclusion in Seattle Journal for Social Justice by an authorized administrator of Seattle University School of Law Digital Commons.

609

# The ADA: One Avenue to Appointed Counsel Before a Full Civil Gideon

Lisa Brodoff, Susan McClellan & Elizabeth Anderson[1]

The United States is witnessing a growing advocacy for universal "civil Gideon,"[2] the constitutional right to free legal counsel for low-income people involved in civil litigation.[3] The right to counsel has long been recognized in the criminal context in this country.[4] In the civil arena, however, those who cannot afford to hire attorneys are left to fight to protect their rights on their own, sometimes against legally represented federal, state, and local governments attempting to take away their homes, assets, income, children, or health care.[5]

This fight for a broad-based right to counsel in the civil arena will likely be long and hard, with success far from guaranteed. In recent decisions on both coasts, courts have avoided reaching the civil Gideon issue. For example, the Maryland Court of Appeals, the state's highest court, when given the opportunity to decide whether its state constitution supports providing attorneys to indigent civil litigants, instead ruled on the underlying claim.[6] In Washington State, a brain-injured litigant directly raised the issue of a civil right to counsel when the government sues individuals, but the Court of Appeals found the case moot because the low-income defendant died while the case was on appeal.[7] These cases indicate that the courts, at least in the short term, may be reluctant even to reach the merits of the civil Gideon issue, let alone find a sweeping right to free representation.

In the meantime, low-income clients, unable to afford representation or to find free legal assistance that they desperately need to protect their rights, are going to state and federal courts and administrative hearings on their own. These clients are being evicted, having their homes foreclosed, and

610    SEATTLE JOURNAL FOR SOCIAL JUSTICE

losing health care and public assistance. Until the larger battle for free civil representation is fought and won, the legal community must seek other remedies for low-income clients that, although not sweeping in nature, may provide relief for at least the most vulnerable and those least able to represent themselves.

Who are the litigants least able to represent themselves in court, who would be denied access to our system of justice unless provided with an attorney to advocate for them? Are there litigants who, once inside the courtroom, simply cannot understand what is happening or cannot meaningfully participate in the proceedings, not because they lack education or experience, but because mental or physical disabilities impair their understanding? Any attorney who has represented disabled clients in court, or any judge who has seen litigants with these disabilities attempt to put on a case or defense, knows that the answer to this question is frequently a resounding "yes."

Certain mental disabilities prevent a person from comprehending what is happening in the courtroom or mustering a case. Some examples come readily to mind: mental retardation, dementia, schizophrenia, and severe depression.[8] Similarly, certain physical disabilities sap energy or vitality to the extent that a person is unable to participate meaningfully in court. Some individuals with brain injuries, terminal illnesses, Parkinson's disease, multiple sclerosis, AIDS,[9] apraxia,[10] and end-stage alcoholism[11] may qualify. Simply put, clients with these disabling conditions may be denied access to our justice system without legal representation.

Most people easily understand why clients with physical disabilities, such as blindness or hearing loss, need accommodations to get in the courthouse door and to participate meaningfully in the justice system. For instance, some deaf individuals are denied access to justice through denial of a sign-language interpreter in the courtroom.[12] Only an interpreter can translate the conversation in the proceeding and allow the hearing-impaired person to have her voice heard. Similarly, a person with impaired vision

may be unable to read critical court documents and exhibits without accommodations such as Brailled materials, large-printed court documents, or human readers.[13]  Without these accommodations, including human accommodations like readers and interpreters, civil litigants with these disabling conditions would lose their day in court because they would not be able to communicate with the court or to understand fully the case and its consequences.

The Americans with Disabilities Act (ADA)[14] is the central law *recognizing this reality for those with such disabilities.*[15]  Complementing the ADA and its predecessor, the federal Rehabilitation Act,[16] some state anti-discrimination statutes[17] provide enhanced protections for individuals with disabilities in the court system.[18]  These state and federal laws require that sign-language interpreters, readers, large print documents, widened doorways, and wheelchair ramps be provided to people with disabilities whose access to the system would otherwise be blocked.

In this article, we argue that people whose disabilities prevent them from understanding the proceedings or vigorously participating in their cases need accommodations to access the court system, just as do those with disabilities that require ramps, interpreters, and readers.  We argue that the *only reasonable accommodation under Title II of the ADA,* under the Rehabilitation Act, and under state anti-discrimination statutes for litigants with these disabling conditions is an attorney.  Only an attorney can provide the knowledge, energy, strategy, translation, and understanding to mount a case or provide a defense for those whose disabilities block their ability to do so pro se.

Using the ADA to argue for free legal representation as a courthouse accommodation for certain disabled individuals is both more restrictive and yet broader than arguing for a full civil Gideon.  By definition, ADA accommodations are available only to persons with perceived or actual disabilities that affect their ability to participate in the judicial system.  *Arguments for a civil Gideon right to counsel for civil litigants does not*

restrict that right only to disabled individuals. Rather, a full civil Gideon would provide counsel to all litigants who are unable to afford their own attorney, regardless of disability. On the other hand, the ADA affords a broader remedy because its provisions are not "needs based"; that is, ADA accommodations are available to rich and poor alike, and are not restricted by a litigant's ability to pay for an attorney accommodation.[19] No financial application is required to receive an ADA accommodation.

The likely reality, however, is that those disabled individuals who need legal representation to defend or to pursue a claim, and who have the financial means to hire private counsel of their own choice will do so, even if, theoretically, they may be provided an attorney as a reasonable accommodation by the courts free of charge. Finally, individuals with disabilities are by and large more likely to be poorer than the population as a whole.[20] Thus, the impact of providing legal representation as an accommodation will most likely benefit those who are financially most in need.[21] As a result, we argue that all civil litigants with disabilities that prevent them from understanding or participating in the legal system should receive appointed counsel.

The first section of this article discusses the basic arguments and procedures for proving a disability under the ADA and seeking legal representation as a reasonable accommodation for clients in courts. The second section addresses representation for clients in administrative hearings. In administrative hearings, clients with disabilities are most often left to fight alone for rights to food (such as Food Stamps), income (such as Temporary Assistance for Needy Families, General Assistance, Supplemental Security Income, and Social Security), and health care (such as Medicare and Medicaid). The third section discusses additional policy arguments supporting the case for legal representation under anti-discrimination laws. The final section suggests ways to present these arguments to courts so that eligible litigants can access free legal representation in appropriate cases.

ACCESS TO JUSTICE—A CALL FOR CIVIL GIDEON

I. COURTS VIOLATE THE ADA BY DENYING APPOINTED COUNSEL AS
A REASONABLE ACCOMMODATION FOR CERTAIN DISABLED CIVIL
LITIGANTS.

More than 49.7 million Americans, roughly one in five of the 257.2 million people in the United States age five or older, have mental or physical disabilities or other long-lasting impairments.[22]  Before the enactment of the ADA, Congress recognized that current laws were "'inadequate' to combat the 'pervasive problems of discrimination that *people with disabilities are facing.'"[23]  *As a result of this discrimination,* Congress enacted the ADA in 1990, seeking to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."[24]

Title I of the ADA addresses discrimination in employment and applies to "persons engaged in an industry affecting commerce" who have at least fifteen employees (the United States and bona fide private membership clubs other than labor unions are exempt).[25]  Title II addresses discrimination in public services and applies to state and local governments, their departments, agencies, and other instrumentalities.[26]  In fact, Title II covers all public agencies, regardless of whether they receive federal *financial assistance.*[27]  *Title III of the ADA addresses discrimination in* places of public accommodation and services operated by private entities.[28] Businesses governed by Title III include banks, restaurants, supermarkets, hotels, shopping centers, privately owned sports arenas, movie theaters, private day-care centers, schools and colleges, accounting or insurance offices, lawyers' and doctors' offices, museums, and health clubs.[29]  Title IV of the ADA addresses telecommunications, including closed captioning and relay services for people with hearing impairments.[30]

Denying appointed counsel for certain disabled civil litigants violates Title II, the Public Services section, of the ADA.[31]  Title II prohibits discrimination against disabled individuals in public services.[32] *Specifically, Title II provides that, "no qualified individual with a disability*

shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity,[33] or be subjected to discrimination by any such entity."[34]  State courts, as public entities, must comply with Title II of the ADA[35] by ensuring that all of their services, programs, and activities are available to qualified individuals with disabilities.  Federal courts must meet the same standard under Section 504 of the Rehabilitation Act.[36]  In fact, Title II of the ADA was "expressly modeled after"[37] sec. 504 of the Rehabilitation Act of 1973[38] and extends those principles to state and local governments.[39]  Failing to make state court facilities available to disabled individuals violates the ADA, while failing to make federal court facilities available violates the Rehabilitation Act.[40]

The critical importance of the ADA in providing individuals with disabilities access to the justice system is clearly illustrated by the facts and legal arguments in *Tennessee v. Lane*,[41] which is currently awaiting a decision by the U.S. Supreme Court.  The State of Tennessee charged George Lane, a paraplegic who requires a wheelchair to ambulate, with two criminal misdemeanors and summoned him to court to appear and answer the charges.

> When George Lane showed up at the Polk County Courthouse with a crushed hip and pelvis, he had a problem.  His hearing was on the second floor, there was no elevator, and the judge said he had better get upstairs.  Mr. Lane, both of whose legs were in casts, somehow managed to get out of his wheelchair and crawl up two flights of stairs.  "On a pain scale of 1 to 10, it was way past 10," he says.
>
> While Mr. Lane crawled up, he says, the judge and other courthouse employees "stood at the top of the stairs and laughed at me."  His case was not heard in the morning session, he says, and at the lunch break he crawled back down.  That afternoon, when he refused to crawl upstairs again, he was arrested for failing to appear, and put in jail.[42]

ACCESS TO JUSTICE—A CALL FOR CIVIL GIDEON

Mr. Lane and another plaintiff, a wheel-chair bound court reporter who could not work in many Tennessee courtrooms because they were inaccessible, sued the state on behalf of a class of physically disabled persons. They argued for injunctive relief and damages under Title II of the ADA. The State argued that Eleventh Amendment immunity applies, thereby protecting the State from private suits for money damages. The Sixth Circuit held that the Eleventh Amendment immunity of the states to private damages suits did not apply to claims under Title II of the ADA, *when the claim involved the Due Process Clause.*

> Parties in civil litigation have an analogous due process right to be present in the courtroom and to meaningfully participate in the process unless their exclusion furthers important governmental interests. . . . These guarantees are protective of equal justice and fair treatment before the courts. The evidence before Congress when it enacted Title II of the Americans with Disabilities Act established that physical barriers in government buildings, including courthouses and in the courtrooms themselves, have had the effect of denying disabled people the opportunity to access vital services and to exercise fundamental rights guaranteed by the Due Process Clause.[43]

In this article, we argue that the denial of equal justice and fair treatment before the courts applies with equal vigor when a person's mental or physical disabilities prevent him not from mounting the stairs to the courtroom, but from mounting the case itself. Here, the appropriate and reasonable accommodation is attorney representation rather than elevator access to the court proceedings.

The failure to make court facilities available to disabled individuals also violates the Washington Law Against Discrimination (WLAD).[44] Generally, WLAD bans discrimination on the basis of "any sensory, mental, or physical disability."[45] Further, the WLAD makes the right to be free from discrimination a civil right[46] and protects "the right to the full enjoyment of any of the accommodations, advantages, facilities, or

privileges of any place of public resort, accommodation, assemblage, or amusement."[47]  The ADA provides guidance for interpreting a public entity's obligations under WLAD.[48]

To prove that a public program or service violates the ADA, a litigant need only show that (1) she is a "qualified individual with a disability"; (2) she "was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity"; and (3) "such exclusion, denial of benefits, or discrimination was by reason of his [or her] disability."[49] After a litigant establishes discrimination by a public entity under Title II, the court must determine the appropriate remedy.[50]

The ADA provides three ways to prove that a litigant is a "qualified individual with a disability."  A "person with a disability" is defined as someone who has "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[51]

Once a litigant proves a disability, she must prove that the disability excluded her from participating in or denied her the benefits of the court's services, programs, or activities.  The regulations require that these services, "when viewed in [their] entirety," be readily accessible to and usable by individuals with disabilities.[52]  Exceptions exist only when compliance results in "undue financial or administrative burdens" or results in a "fundamental alteration" in the program.[53]  The public entity must also provide notice to individuals with disabilities of the "protections against discrimination assured them" and "disseminate sufficient information" to those individuals "to inform them of the rights and protections afforded by the ADA."[54]  Altogether, "the program access requirement of Title II should enable individuals with disabilities to participate in and benefit from the services, programs, or activities of public entities in all but the most unusual

cases."[55]   Trial courts, as services within the meaning of Title II,[56] must provide these protections.

The third step in establishing disability discrimination under Title II requires showing that such exclusion or denial of a service or benefit was by reason of an individual's disability.[57]  Courts fail to make their services accessible to litigants who are not able to use the system effectively because of mental or physical impairments.  Meaningful access does not exist when a litigant's inability to understand or to participate in proceedings because *of a disability surpasses the mere confusion many lay persons experience* when participating in the legal system.  As the Honorable Robert W. Sweet, in proposing full civil Gideon, has noted:

> As every trial judge knows, the task of determining the correct legal outcome is rendered almost impossible without effective counsel.  Courts have neither the time nor the capacity to be both litigants and impartial judges on any issue of genuine complexity.  As recognized by the *Lassiter* dissent, "By intimidation, inarticulateness or *confusion*, a [litigant] can lose forever" the right she sought to protect.[58]

When confusion stems from a disability, Judge Sweet's admonition carries even more force.  A disabled litigant may be physically present in the courtroom but have little understanding of the law and proceedings and little ability to advocate for her rights.  A factual showing that a litigant does not understand proceedings and cannot meaningfully participate because of a disability compels the court to consider providing reasonable accommodations.[59]  A public entity, including a court, must reasonably accommodate a qualified individual with a disability.[60]  Mere equality of treatment is insufficient.[61]

Upon receiving a request for an accommodation, a public entity's duty is well settled by state and federal case law and by the applicable regulations.[62]  First, the public entity must undertake a fact-specific investigation to determine what constitutes a reasonable accommodation

618   SEATTLE JOURNAL FOR SOCIAL JUSTICE

and must provide the criteria by which to determine whether the evaluation is adequate.[63]   The ADA and the Rehabilitation Act attempt to provide whatever services or actions are necessary to ensure that disabled persons are not discriminated against as a result of their disabilities.   One court noted, "mere speculation that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement; the Acts create a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations [are] necessary."[64]

Necessary accommodations include effective courtroom communications: "a public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others."[65] Appointment of counsel, which would allow the individual with a disability to communicate with the court, could qualify as a reasonable accommodation because it is similar to the following sample aids and services provided in the regulations:

> 1.   Qualified interpreters, note takers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments [for example, talking calculators and real time transcription];
>
> 2.   Qualified readers, taped texts, audio recordings, Brailled materials, large print materials, or other effective methods of making visually delivered materials available to individuals with visual impairments;
>
> 3.   Acquisition or modification of equipment or devices; and other similar services or actions.[66]

ACCESS TO JUSTICE—A CALL FOR CIVIL GIDEON

This extensive list and the final, separate category for "other similar services or actions" suggest a broadly-based evaluation of appropriate auxiliary aids and services. These services include the assistance of trained individuals, such as sign-language interpreters for the deaf and readers for the blind. Appointed counsel for some litigants with certain disabilities would serve the same interpretive function and would allow the litigants to participate in the proceedings.

Appointed counsel would not be necessary for all litigants who suffer *from certain disabilities. The degree of impairment matters,* as does the specific setting and alternative accommodations available. For this reason, the ADA does not prescribe the appropriate accommodation for each disability because an appropriate accommodation for one person might be inappropriate for another. For example, while one visually-impaired person might need a reader, another might need materials in Braille.[67] The public entity, however, must consider available options and furnish "appropriate auxiliary aids and services where necessary."[68] In determining the appropriate aid or service, the public entity shall give "primary consideration" to the requests of the individual with disabilities.[69] Accordingly, a court cannot offer a blanket accommodation for all *individuals with a specific disability; it must consider the particular* individual's need when determining which accommodations are reasonable.[70]

For some litigants with disabilities—those who cannot understand or participate in the legal proceedings—interpreters are the only appropriate accommodation. Other options would not ensure that a court's communications with such individuals are "as effective as communications with others,"[71] as required by law.[72] For example, although one commentator has suggested that the best current option for providing legal assistance for the poor lies in improving pro se assistance projects,[73] that proposal would provide no benefit to litigants whose disabilities impair *their ability to understand or to partake in the legal process.* Similarly,

simplifying the legal process by redrafting forms and restructuring procedures would not help litigants with such disabilities, even though simplification might help some indigent civil litigants.[74]  Even if individuals with such disabilities could understand simplified forms, they are unlikely to understand the underlying legal issues.  Furthermore, if individuals' disabilities weaken them to the extent they cannot participate in the process, a simplified procedure would still preclude meaningful access to the courts.

Arguments that the cost of appointed counsel renders the accommodation unreasonable lack merit.  Providing an attorney for litigants with these disabilities is not only appropriate but also reasonable in terms of cost,[75] and would neither create an "undue burden" for the courts nor "fundamentally alter" the nature of the court system.[76]  "Title II ensures that the refusal to accommodate an individual with a disability is genuinely based on unreasonable cost or actual inability to accommodate, not on inconvenience or unfounded concerns about costs."[77]  In addressing the cost issue in the employment context under Title I of the Rehabilitation Act,[78] courts have focused on the big picture, namely the overall costs to society stemming from lack of funding, rather than simply the dollars required to pay for legal services.[79]  For example, in *Nelson v. Thornburgh*, the Third Circuit concluded that a large state agency was required to accommodate a group of entry-level welfare agency workers with visual impairments by providing readers for one-half of the working day and emergency access to a reader the remainder of the day.[80]  The court reasoned that "when one considers the social costs which would flow from the exclusion of persons such as the plaintiffs from the pursuit of their profession, the modest cost of accommodation—a cost which seems likely to diminish, as technology advances and proliferates—seems, by comparison, quite small."[81]  While providing specialists to assist disabled litigants might be an undue hardship for some small agencies or businesses, providing them for large businesses or agencies is reasonable.[82]

ACCESS TO JUSTICE—A CALL FOR CIVIL GIDEON

Other considerations also indicate that providing attorneys for litigants with certain disabling conditions would not bankrupt the system. First, the number of litigants with such disabilities is relatively small compared to the pool of indigent civil litigants. Commentators argue that costs, even for full civil Gideon, are not unduly burdensome and that, in fact, some resources will be conserved.[83] For example, Justice Earl Johnson notes that other countries have provided free counsel as a matter of right in civil cases, as have several pre-paid legal insurance programs in this country.[84] Bidran and Ben-Cohen argue that providing counsel for indigent civil defendants would save society money in the long run[85] by reducing litigation and eliminating the delays prevalent in pro se representation.[86] This prediction is consistent with a study finding that funding legal services programs saves significant state funds.[87] Finally, additional societal benefits, perhaps worth more than the cost, could accrue, with the primary benefit being restored confidence in the justice system.[88]

## II. REPRESENTATION FOR APPELLANTS IN ADMINISTRATIVE HEARINGS

The arguments under the ADA and Rehabilitation Act for legal representation as a reasonable accommodation apply, in almost the same manner, to the administrative hearing context. People with disabilities are regularly appellants in administrative hearings, appealing a state or federal agency's denial, reduction, or termination of critical public assistance benefits involving access to food, shelter, income, and health care. Appeals of benefits like Unemployment Compensation, Worker's Compensation, Food Stamps, Social Security, Supplemental Security Income (SSI), General Assistance, Temporary Assistance for Needy Families (TANF), Medicaid, and Medicare often involve disabled individuals because disability is frequently a prerequisite to eligibility for these benefits.[89] The law in these areas can be complex, involving federal and state statutes and regulations and cases interpreting them. In addition, these hearings can be

factually complicated, requiring appellants to put on evidence of their disabilities, work records, medical records, and finances. In most instances, appellants with disabilities appear pro se at their administrative hearings to fight for these significant benefits.[90]

Appellants navigating the hearings process whose disabilities prevent them from understanding the proceedings or putting on a case would greatly benefit from the ADA and Rehabilitation Act arguments. State agencies that hold administrative hearings are, by definition, "public entities" under the ADA, as are federal agencies under the Rehabilitation Act.[91] Like state and federal courts, executive branch agencies are required by law to include qualified individuals with disabilities in the provision of all services.[92] Courts have applied the Acts to the accessibility of public meetings,[93] community mental health board of trustee meetings,[94] and access to the child welfare system.[95] Surely, if accommodations are required in these settings, they are also required in all administrative hearings.[96]

In fact, the Washington State Office of Administrative Hearings (OAH)—the state agency responsible for conducting hearings for the state Department of Social and Health Services (DSHS),[97] the Employment Security Department, and the Office of Superintendent of Public Instruction (for special education benefits hearings), among forty others—tells public assistance appellants in the "Hearing Rights" pamphlet it sends with every Notice of Hearing that it is subject to the ADA and Rehabilitation Act and will provide reasonable accommodations for disabled litigants to access the hearing system.[98]

In the administrative hearings situation, reasonable accommodation might require attorneys for the hearings of some agencies, but not others. Unlike the state and federal courts, the administrative hearing setting does not always require that a legal representative be a licensed attorney.[99] For example, in Washington State, OAH hearings on behalf of DSHS and Employment Security allow representatives who are not licensed attorneys to represent appellants.[100] For those hearings, arguably, a trained lay

representative, law student, or paralegal, rather than a lawyer, would be a reasonable accommodation. In those state[101] and federal[102] hearings where only lawyers can act as representatives, however, the only allowable accommodation is to provide attorney representation.

Legal representation seems critical for public benefits hearings in particular because they involve access to critical "brutal needs"[103] assistance for low-income and disabled litigants, and the law is particularly complex and difficult to parse. Moreover, because low-income people who *rely on public benefits to meet basic needs lack the resources to hire* lawyers to take their appeals to the court system, the administrative hearing process is likely the only justice system available to them. Without legal representation at the hearing, appellants with disabilities that prevent them from making cogent legal arguments will likely lose.[104] Using the ADA to get representation for these clients as a reasonable accommodation could be the difference between hunger and adequate nutrition, illness and health care, or homelessness and shelter.

III. POLICY ARGUMENTS DEMONSTRATING THE REASONABLENESS OF APPOINTED COUNSEL

Several policy concerns, both national and international, support appointing counsel for certain individuals with disabilities who are involved in judicial or administrative proceedings. Moreover, arguments supporting counsel for indigent civil litigants apply with even greater vigor to the plight of civil litigants with certain disabilities. These arguments are based on the historical development of the right to appointed counsel in both criminal and civil contexts in the United States; the disparity between the protections afforded to civil litigants by all other major Western nations and the utter lack of systemic protections for civil litigants in the United States; and notions of fundamental fairness, both actual and perceived.[105]

Civil litigants who are disabled to such an extent that they cannot comprehend or participate in court proceedings have a greater need for

counsel than other civil litigants, yet courts in the United States have been reluctant to recognize this need. This reluctance follows a pattern of incremental recognition of the right to counsel in both the criminal and civil contexts. Even though the Sixth Amendment unequivocally guarantees the right to counsel for criminal defendants, only those defendants charged with capital offenses enjoyed the right prior to the 1930's.[106] From the 1930's through the 1960's, the Supreme Court expanded coverage, first by recognizing the right to counsel for all federal defendants, then by extending the right to defendants in state courts in specific situations.[107]

Appointment of counsel in civil matters, though lagging behind appointment of counsel for criminal defendants, is not a new concept in the United States. In 1948, Congress granted the federal courts statutory authority to appoint counsel for indigent civil litigants.[108] The Third Circuit Court of Appeals interpreted 28 U.S.C. § 1915 as affording district courts "broad discretion" to determine whether appointment of counsel in a civil case would be appropriate.[109] The Third Circuit rejected several courts' interpretations that appointment of counsel in civil cases should be granted only under "exceptional circumstances."[110] Yet even under the exceptional circumstances analysis, courts have found that, in the balance of factors, the standard was met to allow appointment of counsel. For example, the Fourth Circuit found exceptional circumstances existed where the plaintiff lacked education in legal matters, his incarceration status prevented contact with witnesses, the testimony was conflicting, and the plaintiff lacked training in cross-examination.[111]

In determining whether a district court should order appointment of counsel, the Third Circuit articulated a number of factors to consider, without reference to the stringent exceptional circumstances standard.[112] The threshold consideration here is whether the plaintiff's claims have "arguable merit in fact and law."[113] If the court determines a claim has sufficient merit, then it must consider factors regarding the plaintiff's ability to present her case, such as "education, literacy, prior work experience, and

prior litigation experience."[114]    The court should also weigh the complexities of the legal issues and the need for factual investigation.[115] The appointment of counsel may be appropriate when the likelihood exists that extensive discovery or expert testimony will be required, or that credibility determinations will play a significant role in the trial.

The Third Circuit's test, known as the *Tabron* test, has been adopted by one court in a Title II ADA action.[116] While the court ultimately held that the plaintiff was not entitled to appointment of counsel, the court found her *claim sufficiently meritorious to warrant consideration of the additional* factors relevant to the appointment of counsel.[117] In weighing the factors, the court determined that the plaintiff had, at a minimum, a college education; she presumably had access to public law libraries where she could conduct any necessary research; expert testimony was unlikely to be required; and the case did not present unusually complex legal issues.[118] These factors weighed against the appointment of counsel in that case. The door was left open, however, for the appointment of counsel in civil matters with more compelling circumstances. Arguments for appointed counsel may prevail, for example, when expert testimony is required, the case presents unusually complex issues, and the plaintiff does not have a college *education and has a mental disability that prevents her from comprehending* complex matters in the courtroom. When some of these circumstances exist, plaintiffs should request the assistance of counsel.

Title VII of the Civil Rights Act of 1964[119] also permits courts to appoint counsel for the plaintiff on request in an employment discrimination suit.[120] In making the determination, courts consider three factors: the financial resources of the plaintiff, efforts made to secure counsel, and the merit of the plaintiff's claim.[121]    Commentators have noted a key conundrum inherent in the test: the problem of determining the merits of a case before the case has been presented, especially without counsel to assess and present the merits.[122] This problem is compounded when a litigant has a *disability that prevents or impairs understanding and participating in court*

proceedings. This additional consideration might assist a plaintiff with such a disability in obtaining counsel in employment discrimination cases.

This individualized, piecemeal approach to achieving the right to counsel for civil litigants with certain disabilities will likely parallel the same slow, incremental advancements that have marked the development of the right for both criminal and civil litigants in this country. While the United States struggles for incremental advancements, many developed countries provide appointed counsel for indigent civil litigants,[123] even if they are not disabled. Courts in these countries ground their analyses in statutes, as in England;[124] in constitutions, as in Switzerland; or in a combination of the two, as in Germany.[125] Moreover, the European Convention of Human Rights "guarantees the right to counsel in civil cases, recognizing it as a fundamental right."[126]

Although United States courts and citizens have generally rejected any notion that our country is not the world leader in issues of justice,[127] some justices are willing to consider approaches and reasoning of other nations.[128] As Justice Earl Johnson noted, United States Supreme Court Justices Ruth Bader Ginsburg, Sandra Day O'Connor, and Anthony Kennedy, while speaking at conferences, have all suggested that the Court is willing to consider jurisprudence from other nations.[129] In fact, as Justice Johnson observed, Justice Kennedy, writing for a six-justice majority in *Lawrence v. Texas*,[130] "relied heavily on foreign decisions."[131]

With so many countries recognizing that the right to counsel in civil cases is fundamental, courts in the United States should follow their lead and conclude, at the very least, that a disabled individual who cannot understand or participate in court proceedings is entitled to an attorney. While the average indigent civil litigant has some understanding of court processes and proceedings, the person with certain disabilities does not. In this respect, the United States cannot continue to lag so far behind the other major Western nations of the world.[132]

Three additional notions of fairness, which commentators have noted for all civil litigants,[133] apply with equal or greater force in the present context. First, in some contexts, civil litigants who may be more disadvantaged by lack of counsel than criminal litigants.[134] For example, the loss of custody of a child or civil commitment as an incompetent, may, in the long run, be far more agonizing than incarceration for a short period of time.[135] Second, where the state brings a suit against a disabled defendant to deprive access to food, shelter, children, or health care, the civil preponderance-of-the-evidence standard *is much easier to prove than the beyond-a-reasonable-*doubt standard for criminal cases.[136] As a result, in a civil suit, the state could more easily prevail and deprive a person of critical benefits. Finally, citizens lose faith in our justice system when it seems to be unfair.[137] Few acts are more unfair than denying the appointment of counsel for a civil litigant whose disability prevents her from understanding or participating effectively in the proceedings.

IV. PRACTICAL CONSIDERATIONS IN OBTAINING ATTORNEY REPRESENTATION FOR DISABLED CLIENTS

These ADA arguments may never be made for those most in need unless an organized approach to evaluating a litigant's need for an accommodation and a referral system is in place to get representation for disabled clients. Yet, finding the litigants that need an attorney accommodation may be difficult because of the very nature of their disabilities. Litigants whose disabilities cause them to be too confused or weak to forward their causes in court may also be unable to ask the court, effectively, for legal representation. Furthermore, because of their disabling conditions, these litigants are also unlikely to be able to put forth the sophisticated legal arguments required to make the case for an attorney accommodation. How, then, will these cases be brought to the attention of legal services providers who can then make these arguments on behalf of clients?

Advocates for the disabled should take a more proactive and organized approach in identifying these clients and providing this accommodation by meeting with court personnel, administrative agency management, and judges to discuss these issues.   Additionally, ADA coordinators in the courts and in administrative agencies should be assigned the task of evaluating the need for an attorney accommodation and creating an internal appeal process for challenging an accommodation denial in the same way other disability accommodations are evaluated and appealed.

Judges and administrative hearing officers—the people who may be in the best position to initially identify whether a litigant needs an attorney accommodation—should be trained to identify and refer litigants to courthouse ADA coordinators for arranging representation.   Courts and administrative agencies must then develop contracts with legal services providers to supply legal representation in these cases.

Before such a system is in place, non-profit legal services organizations may have to create a caller-screening system to identify clients to represent solely for the purpose of arguing for attorney accommodation in their legal disputes.   Such screening systems are already being developed to find appropriate plaintiffs to bring litigation to establish a general civil Gideon.[138]   To make the argument for an attorney accommodation for disabled litigants who come to the attention of providers through a screening process, legal services organizations, advocacy groups for the elderly and disabled, or pro bono attorneys might have to make special appearances in identified cases, appearing for the sole purpose of arguing for an ADA accommodation.

Making a limited appearance, however, has inherent dangers.   In a recent Maryland case, the argument that a free lawyer must be provided to all low-income civil litigants under the Maryland Constitution was raised.   Although the court did not reach the merits of the issue, it did comment that "Ms. Frase, as noted, is well represented by counsel in this appeal, and there is no assurance that, should any further litigation be brought by or against

Ms. Frase, she would not be represented in that litigation."[139] Further, the court noted that it would not make the assumption that the five attorneys and numerous pro bono organizations that specially appeared in the case to argue for civil Gideon would "then abandon her," should she need further representation on the underlying merits of her case.[140] Therefore, courts may, as did the Maryland Court of Appeals, ignore the special appearance and require that the attorney provide representation in the underlying case.

Advocacy groups and justice systems must address these issues regarding *client identification and referral so that those litigants who need* representation are served. No isolated group can address these issues effectively. To solve these issues, courts, administrative agencies, non-profit legal service organizations, bar associations, pro bono attorneys, and advocacy groups for the disabled must work together to obtain meaningful results.

## V. CONCLUSION

With full civil Gideon still on the distant horizon, advocates should use the ADA and the Rehabilitation Act to argue that appointed counsel is necessary for civil litigants with certain disabilities. Both state and federal courts are required to make their services equally accessible to those with disabilities. Currently, neither courts nor administrative hearings are accessible for those whose disabilities impair their capacity either to understand or to partake in the proceedings. Although alternative aids or services might be appropriate for some of these litigants, others will require attorney representation.

Appointed counsel for these civil litigants is not only appropriate but also reasonable. The number of these litigants is relatively small when compared to the total number of indigent civil litigants in the country. The costs seem even smaller compared with the almost certain loss of crucial needs, such as food, housing, income benefits, and property if the litigant is without attorney representation. Moreover, greater loss accrues from

630   SEATTLE JOURNAL FOR SOCIAL JUSTICE

citizens' lost faith in the justice system. With all the major European nations and the European Court of Human Rights granting free attorney representation in civil cases, the United States must be able to protect its most vulnerable civil litigants: those whose disabilities prevent them from understanding or fully participating in judicial and administrative proceedings.

Advocates and the justice system, working together, can remedy this problem. By focusing on the true meaning of the ADA's requirement of reasonable accommodation, the bench and bar can devise methods for screening and evaluating clients, creating contracts in order to represent them, and devising systems for administering and evaluating the program. Only then will civil litigants with certain disabilities have real access to the justice system.

---

[1] Lisa Brodoff, Clinical Professor of Law, and Susan McClellan, Legal Writing Professor, both teach at Seattle University School of Law; Elizabeth Anderson is a 2003 graduate of Seattle University School of Law. The authors wish to thank Sarabeth Zemel for her editorial assistance and law librarian Stephanie Wilson for her extraordinary research skills and support.
[2] "Civil Gideon" is a term used to describe efforts to establish a right to counsel in civil cases. The case that established this right in the criminal context was Gideon v. Wainwright, 372 U.S. 335 (1963). Anthony Lewis popularized Mr. Gideon's story in his book *Gideon's Trumpet*. ANTHONY LEWIS, GIDEON'S TRUMPET (Vintage Books, 1989) (1966).
[3] *See, e.g.,* Earl Johnson, Jr., *Will Gideon's Trumpet Sound a New Melody? The Globalization of Constitutional Values and Its Implications for a Right to Equal Justice in Civil Cases,* 2 SEATTLE J. SOC. JUST. 201 (2003) [hereinafter *New Melody?*] (the author has served as a Justice for the California Court of Appeal since 1982); Earl Johnson, Jr., *Equal Access to Justice: Comparing Access to Justice in the United States and Other Industrial Democracies,* 24 FORDHAM INT'L L.J. 83 (2000); Robert W. Sweet, *Civil Gideon and Confidence in a Just Society,* 17 YALE L. & POL'Y REV. 503 (1998); Deborah Perluss, *Washington's Constitutional Right to Counsel in Civil Cases: Access to Justice v. Fundamental Interest,* 2 SEATTLE J. SOC. JUST. 571 (2004).
[4] Gideon v. Wainwright, 372 U.S. 335, 342–43 (1963) and its progeny (*see, e.g.,* Argersinger v. Hamlin, 407 U.S. 25 (1972) (extending right to counsel to misdemeanor cases); Escobedo v. Illinois, 378 U.S. 478, 490–91 (1964) (extending right to counsel to uncharged suspect); Douglas v. California, 372 U.S. 353, 357–58 (1963) (extending right to counsel to direct appeals)).

*One Avenue to Appointed Counsel Before a Full Civil Gideon*  631

[5]  *See* MAURO CAPPELLETTI, ET AL., TOWARD EQUAL JUSTICE: A COMPARATIVE STUDY OF LEGAL AID IN MODERN SOCIETIES 140–66 (Vincenzo Varano ed., 1975); Earl Johnson, Jr., *The Right to Counsel in Civil Cases: An International Perspective*, 19 LOY. L.A. L. REV. 341 (1985); Francis William O'Brien, *Why Not Appointed Counsel in Civil Cases? The Swiss Approach*, 28 OHIO ST. L.J. 1, 5 (1967). Some state statutes and court rules do provide appointed counsel for indigent litigants in certain circumstances, such as juvenile dependency and termination of parental rights. *See, e.g.*, WASH. REV. CODE § 13.34.090 (2002).

[6]  Frase v. Barnhart, 840 A.2d 114 (Md. Dec. 11, 2003). In a four-three decision, the majority declared it "inappropriate" to rule on the litigant's claim of a "right to counsel," citing the litigation's commencement, among other reasons; however, the three *concurring judges not only would have addressed the civil Gideon issue but also would* have found that a constitutional right to counsel exists. *Id.* at 115, 138.

[7]  City of Moses Lake v. Smith, No. 21783-3-III, slip op. (Wash. Ct. App. May 21, 2003) (dismissed as moot by Order Denying Motion to Modify Commissioner's Ruling).

[8]  Depression and other mental disorders are considered disabilities under the ADA. Olson v. Gen. Elec. Astrospace, 966 F. Supp. 312, 316 (D.N.J. 1997). *See, e.g.*, Pritchard v. Southern County Servs., 92 F.3d 1130, 1132 (11th Cir.1996), *amended on reh'g*, 102 F.3d 1118 (11th Cir.1996); Shea v. Tisch, 870 F.2d 786, 789 (1st Cir.1989); Doe v. Region 13 Mental Health-Mental Retardation Comm'n, 704 F.2d 1402, 1408 (5th Cir.1983).

[9]  *See* Henrietta D. v. Giuliani, 119 F. Supp. 2d 181, 206 (E.D.N.Y. 2000) (finding city program failed to provide meaningful access to public assistance programs, benefits, and services to individuals suffering from AIDS).

[10]  *See, e.g.*, Arneson v. Sullivan, 946 F.2d 90, 92–93 (8th Cir. 1991) (holding that the Social Security Administration must reinstate a former employee who suffers from apraxia, provide him with computer training at least equal to that received by other employees with disabilities, make reasonable efforts to provide a distraction-free environment, and provide him with a "reader" to ensure he receives assistance at a level given to other employees with disabilities). Apraxia is a neurological disorder that results in "difficulty in bringing ideas together, difficulties in writing, distractibility, [and] motor awkwardness." *Id.* at 91 (quoting Arneson v. Heckler, 879 F.2d 393, 399 (8th Cir. 1989)).

[11]  Office of Senate Sergeant at Arms v. Office of Senate Fair Employment Practices, 95 F.3d 1102, 1105–06 (Fed. Cir. 1996). *See also* 29 C.F.R. App. § 1630.16(b) (2003).

[12]  Soto v. City of Newark, 72 F. Supp. 2d 489, 494–95 (D.N.J. 1999) (holding that the court violated Title II of the ADA when deaf litigants were denied a sign-language interpreter at municipal court wedding). *See also, e.g.*, Duvall v. County of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001); Bravin v. Mount Sinai Med. Ctr., 58 F. Supp. 2d 269, 273 (S.D.N.Y. 1999) (holding that a hospital violated the ADA when it denied a deaf father the use of a qualified interpreter during Lamaze classes, which he attended with his wife); DeVinney v. Me. Med. Ctr., 1998 WL 271495, 1 (D. Me. 1998) (approving a consent decree whereby Maine Medical Center would provide appropriate auxiliary aids and services where such aids and services were necessary to ensure effective communication with persons who were deaf).

[13] ADA Title II Technical Assistance Manual II–7.1000 (2003), *at*
http://www.usdoj.gov/crt/ada/taman2.html (last viewed Feb. 29, 2004). *See also* Engle
v. Gallas, No. CIV. A. 93-3324, 1994 WL 263347, *1–2 (E.D. Pa. June 10, 1994); Fink
v. N.Y. Dep't of Pers., *53 F.3d 565, 568–69 (2d Cir. 1995)* (city personnel satisfied its
obligation to reasonably accommodate blind employees who took civil service promotion
exams when it provided them with taped versions of the exam, a tape player, a reader,
and extra time); Galloway v. Super. Ct., 816 F. Supp. 12, 18 (D.C. Cir. 1993) (court
system is a "public entity" under the ADA and must provide reasonable accommodations
for juror's visual limitations).
[14] Americans with Disabilities Act of 1990, Pub. L. No. 101–336 (codified as amended
at 42 U.S.C. §§ 12101–12213 (2000)).
[15] The Court Interpreters Act also recognizes the right of the hearing impaired to have an
interpreter in proceedings instituted by the United States when the impairment inhibits
"such party's comprehension of the proceedings or communication with counsel or the
presiding judicial officer." 28 U.S.C. § 1827(d)(1)(B) (2000).
[16] 29 U.S.C. §§ 701–796l (2003).
[17] The Washington Law Against Discrimination, WASH. REV. CODE §§ 49.60.010–.401
(2002). *See also, e.g.,* WASH. REV. CODE § 11.88.045(1)(a) (2002) (providing indigent
"allegedly incapacitated individuals" with "the right to be represented by willing counsel
*of their choosing at any stage in guardianship proceedings.").*
[18] Several states, including Washington, Alabama, Connecticut, Minnesota, New Jersey,
North Carolina, and North Dakota, have more expansive state anti-discrimination
statutes. *See* WASH. REV. CODE §§ 49.60.010–.401 (2002); ALA. CODE § 12–1–23
(2003); "Unruh Civil Rights Act," CAL. CIVIL CODE § 51 (West 2004); CAL. CIVIL CODE
§ 54 (a) (West 2004); CONN. GEN. STAT. §§ 46a–64 (2003); "Minnesota Human Rights
Act," MINN. STAT. § 363A.01 (2003); "New Jersey Law against Discrimination," N.J.
STAT. ANN. § 10:5–4.1 (West 2003); "North Carolina Persons with Disabilities
Protection Act," N.C. GEN. STAT. § 168A–7 (2003); N.D. CENT. CODE § 14–02.4–15
(2003).
[19] 28 C.F.R. § 35.130(f) (2003). This regulation forbids a public entity from charging
disabled persons "to cover the costs of measures . . . required to provide . . . the
nondiscriminatory treatment required by the . . . [ADA or implementing regulations]."
[20] Stephen Kaye, *Is the Status of People with Disabilities Improving?*, Disability
Statistics Center (May 1998), *available at* http://dsc.ucsf.edu/publication.php?pub_id=7.
[21] In 1994, 30% of disabled working-age adults lived in poverty. *Id.*
[22] Brief of Amici Curiae American Bar Association, Tennessee v. Lane, 315 F.3d 680
(6th Cir. 2003), (No. 02-1667), *cert. granted in part*, 123 S. Ct. 2622 (citing U.S. Census
Bureau, *Disability Status: 2000, available at*
http://www.census.gov/hhes/www/disable/disabstat2k/disabstat2ktxt.html (last visited
Feb. 22, 2004).
[23] Helen L. v. DiDario, 46 F.3d 325, 331 (3d Cir. 1995) (citing S. Rep. No. 116, 101st
Cong., 1st Sess. 18 (1989); H.R.Rep. No 485 (II), 101st Cong., 2d Sess. 47 (1990)).
[24] 42 U.S.C. § 12101(b)(1) (2000).
[25] *Id.* §§ 12111–12117.
[26] *Id.* §§ 12131–12134.

*One Avenue to Appointed Counsel Before a Full Civil Gideon*   633

[27] *Id.* § 12131.

[28] *Id.* §§ 12181–12189.

[29] *Id.* § 12181.

[30] 47 U.S.C. § 225 (2000).

[31] 42 U.S.C. § 12132 (2000).

[32] 42 U.S.C. § 12143 (2000).

[33] The ADA defines "public entities" to include state and local governments and any department, agency, special purpose district, or other instrumentality of a state or local government. 42 U.S.C. § 12131(1).

[34] 42 U.S.C. § 12132 (2000).

[35] *See, e.g., Soto,* 72 F. Supp. 2d at 494–95 (holding that a wedding ceremony performed in municipal court is a "service" within the meaning of the ADA). *See also Saunders v.* Horn, 960 F. Supp. 893, 899 (E.D. Pa. 1997) (finding that management of court systems is a state or local responsibility of great importance that is routinely understood to be covered by the ADA); *Galloway,* 816 F. Supp. at 18 (holding that a court system is a "public entity" under the ADA); People v. Caldwell, 603 N.Y.S.2d 713, 714 (N.Y. Crim. Ct. 1993) (finding that the court system, as a government entity, is required pursuant to the ADA to make all of its services, programs, and activities available to qualified individuals with disabilities). The Department of Justice regulations state that the ADA's coverage extends to "all services . . . made available by public entities." 28 C.F.R. § 35.102(a) (2003).

[36] 29 U.S.C. §§ 701–796l (2000).

[37] *See Duvall,* 260 F.3d at 1135–36; McDonald v. Com. of Mass., 901 F.Supp. 471, 478 (D. Mass. 1995); Helen L. v. DiDario, 46 F.3d 325, 330 (3d Cir. 1995).

[38] Sec. 504 provides, "No otherwise qualified individual with a disability... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

[39] Sec. 504 of the Rehabilitation Act and the ADA impose identical requirements. Lincoln Cercpac v. Health & Hosps. Corp., 147 F.3d 165, 167 (2d Cir. 1998).

[40] The remainder of the article refers primarily to state courts and the ADA, but the analysis applies equally in federal courts.

[41] *Lane,* 315 F.3d 680.

[42] Adam Cohen, *Can Disabled People Be Forced to Crawl Up the Courthouse Steps?,* N.Y. TIMES, Jan. 11, 2004, § 4 (Editorial Desk), at 14.

[43] *Lane,* 315 F.3d at 682.

[44] WASH. REV. CODE §§ 49.60.010–.401 (2002).

[45] WASH. REV. CODE § 49.60.030(1) (2002).

[46] *Id.*

[47] WASH. REV. CODE § 49.60.030(1)(b) (2002).

[48] *See, e.g.,* Fell v. Spokane Transit Auth., 911 P.2d 1319, 1328 (Wash. 1996).

[49] 42 U.S.C. § 12132 (2000). *See also Duvall,* 260 F.3d at 1135 (citing Weinreich v. L.A. County Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997)).

[50] *See, e.g., Duvall,* 260 F.3d at 1139; *Soto,* 72 F. Supp. 2d at 495.

[51] 42 U.S.C. §§ 12102(2) (2000); *see also Duvall,* 260 F.3d at 1135.

634  Seattle Journal for Social Justice

[52]  28 C.F.R. § 35.150(a) (2003).

[53]  28 C.F.R. § 35.150(a)(3) (stating that the public entity has the burden of proving that compliance would require a "fundamental alteration" or "undue financial or administrative burdens").

[54]  Nondiscrimination on the Basis of Disability in State and Local Government Services, 28 C.F.R. § 35.106 (2003); 56 Fed. Reg. 35694 (1991).

[55]  Id.

[56]  Shotz v. Cates, 256 F.3d 1077, 1080 (11th Cir. 2001) (citing Layton v. Elder, 143 F.3d 469, 472 (8th Cir. 1998)).

[57]  42 U.S.C. § 12132 (2000); Duvall, 260 F.3d at 1135.

[58]  Sweet, supra note 3, 505 (quoting Lassiter v. Dept. of Soc. Servs. of Durham County, 452 U.S. 18, 47 (1981)) (emphasis added).

[59]  42 U.S.C. § 12132 (2000).

[60]  Henrietta D. v. Bloomberg, 331 F.3d 261, 277 (2d Cir. 2003) (holding that a litigant with disabilities suing under the ADA or Rehabilitation Act may show that she has been excluded from or denied the benefits of a public entity's services or programs "by reason of such disability," even if there are other contributory causes for the exclusion or denial, as long as the plaintiff can show that the disability was a substantial cause of the exclusion or denial).

[61]  Henrietta D., 119 F. Supp. 2d at 212–13.

[62]  Duvall, 260 F.3d at 1139.

[63]  42 U.S.C. § 12132 (2000).

[64]  Duvall, 260 F.3d at 1136–37 (citing Wong v. Regents of the U. of Cal., 192 F.3d 807, 818 (9th Cir. 1999)).

[65]  28 C.F.R. § 35.160(a) (2003).

[66]  28 C.F.R. § 35.104 (2003); see, e.g., Duvall, 260 F.3d at 1135.

[67]  1 Disability Discrimination in the Workplace § 8:16 (citing the Technical Assistance Manual on the Employment Provisions (Title I) of the ADA, EEOC § 3.10(8)), available at http://www.ada-infonet.org/documents/titleI/tech-assist-man.asp (last visited Feb. 29, 2004), "Depending on the nature of the visual impairment and the job tasks, print magnification equipment or a talking computer may be more effective for the individual and less costly for an employer than providing another employee as a reader." On the other hand, "a reader who transcribes documents onto tapes may be a more effective accommodation" when a person must read lengthy documents. Technical Assistance Manual at § 3.10(8). Similarly, "people with hearing impairments have different communication needs and use different modes of communication. Some use signing in American Sign Language but others use sign language that has different manual codes. Some people rely on an oral interpreter who silently mouths words spoken by others to make them easier to lip read. Many hearing-impaired people use their voices to communicate, and some combine talking and signing." Id. at § 3.10(9). An employer might also be required to offer an attendant or helper as an accommodation for an employee with a disability. See, e.g., Roberts v. Progressive Independents, Inc., 183 F.3d 1215, 1220–21 (10th Cir. 1999) (holding that a jury could find that an employer's refusal to pay for a personal attendant during an airline trip was "not reasonable").

[68]  28 C.F.R. § 35.160 (2003).

Access to Justice—A Call for Civil Gideon

*One Avenue to Appointed Counsel Before a Full Civil Gideon*  635

[69] 28 C.F.R. § 35.160(b)(2) (2003).

[70] *Duvall*, 260 F.3d at 1139.

[71] 28 C.F.R. § 35.160(a) (2003).

[72] The Court Interpreters Act, 28 U.S.C. § 1827(d)(1)(B) (2000).

[73] Deborah J. Cantrell, *Justice for Interests of the Poor: The Problem of Navigating the System Without Counsel*, 70 FORDHAM L. REV. 1573, 1574, 1581 (2002); Deborah L. Rhode, *Access to Justice*, 69 FORDHAM L. REV. 1785, 1816 (2001).

[74] *See* Cantrell, *supra* note 73, at 1578–80 (arguing that simplification, though admirable, is insufficient for addressing the needs of indigent civil litigants); Rhode, *supra* note 73, at 1816.

[75] The cost aspect matters, as a number of commentators have noted, because opponents of civil Gideon argue the expense of such a program would bankrupt the government. *See, e.g.*, Rhode, *supra* note 73, at 1787–88; Earl Johnson, Jr., *Toward Equal Justice: Where the United States Stands Two Decades Later*, 5 MD. J. CONTEMP. LEGAL ISSUES 199, 210–21 (1994) [hereinafter *Toward Equal Justice*].

[76] There is no reasonable argument that providing legal representation as an accommodation within the court system would fundamentally alter the nature of that public entity. Attorneys regularly represent litigants in the court setting, so having representation for a disabled litigant would not be a change in the system.

[77] *Lane*, 315 F.3d at 683.

[78] *See, e.g.*, Nelson v. Thornburgh, 567 F. Supp. 369, 381 (E.D. Pa. 1983), *aff'd*, 732 F.2d 146–47 (3d Cir. 1984). Decisions based on the Rehabilitation Act provide guidance because the ADA regulations "borrowed" the "reasonable accommodation" and "undue hardship" definitions from the regulations promulgated by the EEOC under the Rehabilitation Act.

[79] *Id.* at 381–82.

[80] *Id.*

[81] *Id.* at 382.

[82] *Id.*

[83] Simran Bindra & Pedram Ben-Cohen, *Public Civil Defenders: A Right to Counsel for Indigent Civil Defendants*, 10 GEO. J. ON POVERTY L. & POL'Y 1, 19, 31–35 (2003); Johnson, *Toward Equal Justice*, *supra* note 75, at 219.

[84] Johnson, *Toward Equal Justice*, *supra* note 75, at 219. *See also* Bindra & Ben-Cohen, *supra* note 83, at 32–33 (comparing the funding in other countries to the funding in the United States).

[85] Bindra & Ben-Cohen, *supra* note 83, at 33; *see also* Brief of Amici Curiae American Bar Association, *Lane*, 315 F.3d 680.

[86] Bindra & Ben-Cohen, *supra* note 83, at 33.

[87] *Id.* (citing Helaine M. Barnett, *An Innovative Approach to Permanent State Funding of Civil Legal Services: One State's Experience – So Far*, 17 YALE L. & POL'Y REV. 469, 472 (1998), citing Legal Services Project, Funding Civil Legal Services for the Poor 11 (1998)).

[88] *See* Bindra & Ben-Cohen, *supra* note 83, at 32 (noting that "forty-seven percent of Americans feel that the legal system is biased against the poor and minorities, and nearly ninety percent feel that the affluent and corporate have the upper hand").

636  Seattle Journal for Social Justice

[89] *See e.g.,* Unemployment Compensation, Wash. Rev. Code § 50.06.010 (2003); Worker's Compensation, 5 U.S.C. § 8102 (2000); Social Security, 42 U.S.C. § 402 (2000); Supplemental Security Income (SSI), 42 U.S.C. § 1381a (2000); General Assistance, *Wash. Rev. Code § 74.04.005 (2003)*; Medicaid, *42 U.S.C. § 1396 (2000)*; Medicare, 42 U.S.C. § 1395c (2000), § 1395j.

[90] *See* Washington State Supreme Court, *The Washington State Civil Legal Needs Study, Task Force on Civil Equal Justice Funding, at* http://www.courts.wa.gov (Sept. 2003) (finding that less than 12% of low-income clients with public benefits disputes receive legal representation of any kind).

[91] State agencies are "public entities" under the ADA.  42 U.S.C. § 12131(1) (2000). Federal agencies are "public entities" under the Rehabilitation Act.  29 U.S.C. § 794(a) (2000).

[92] *Id.; see* 28 C.F.R. §§ 35.102(a) and 104 (2003) (public entities subject to the ADA are defined as including "[a]ny department, agency . . . or other instrumentality of a State or States.").

[93] Kansas Hosp. Ass'n v. Whiteman, 835 F. Supp. 1556 (D. Kan. 1993) (holding that a state Medicaid agency's notice of public hearing regarding an increase in the Medicaid co-payment was not defective under the ADA for failure to communicate to disabled persons about their opportunity to participate in the hearing.  However, the court observed that the state had made the hearing accessible to the disabled by providing a sign-language interpreter at the public hearing, and that the hearing was held in a facility accessible to the mobility impaired).

[94] Dees v. Austin Travis County Mental Health & Mental Retardation, 860 F. Supp. 1186 (W.D. Texas 1994).  (holding that the mental health center's board of trustees is a public entity as defined by the ADA, and that it discriminated against mentally ill client recipients of its services by holding board meetings at a time that made it impossible for patients who suffered drowsiness from the effects of medication for mental illness to attend).

[95] Marisol A. by Forbes v. Giuliani, 929 F. Supp. 662 (S.D.N.Y. 1996) (holding that plaintiffs alleged sufficient facts to support claims that state welfare officials violated the ADA when they mishandled children's cases by failing to take modest affirmative steps to ensure that the children had meaningful access to the child welfare system).

[96] In one analogous case involving whether or not a school district must accommodate a disabled parent's request to tape record a hearing-like meeting involving planning and placement for her handicapped child, a Connecticut federal district court held that "participation [in the planning meeting by the parent] means something more than mere presence; it means being afforded the opportunity to be an equal collaborator, whose views are entitled to as much consideration and weight as those of other members of the team, in the formulation and evaluation of their child's education." V.W. v. Favolise, 131 F.R.D. 654, 659 (1990).

[97] DSHS provides "necessary supplemental accommodations" to disabled clients who have a "mental, neurological, physical or sensory impairment . . . that prevent [clients] from getting program benefits in the same way that an unimpaired person would get them." Wash. Admin. Code § 388-472-0010 (2003).  See also Wash. Admin. Code § 388-472-0020 to 0050 (2003) for the parameters of the NSA program.  These accommo-

*One Avenue to Appointed Counsel Before a Full Civil Gideon* 637

dations should also be required for hearings involving DSHS administered public benefits.

[98] *See* OFFICE OF ADMIN. HEARINGS, "Your Hearing Rights in a DSHS Case," OAH pamphlet #100, DSHS pamphlet #22-092, *at* http://www.oah.wa.gov/shs_appeals_en.pdf (last visited on Mar. 29, 2004). The pamphlet tells appellants to contact the OAH office listed on their Notice of Hearing to arrange for accommodations in the hearing. *Id.* at 4.

[99] For example, in SSI and Social Security administrative hearings, the only obligation of the Social Security Administration is to inform the appellant of the right to have legal representation at the hearing, but there is no right to have it provided free of charge and no requirement that the appellant appear with only a licensed attorney. *See* Frank v. Chater, 924 F.Supp. 416, 422, (E.D.N.Y. 1996) ("[a]s an initial matter, it is necessary to *clarify what the cases in this and other Circuits casually refer to as the 'right to* representation' in a benefits proceeding. This 'right' does not rise to constitutional dimensions."); *see, e.g.,* Brandyburg v. Sullivan, 959 F.2d 555, 562 (5th Cir.1992) (citing *Clark,* 652 F.2d at 403) ("The Supreme Court has never recognized a constitutional right to counsel at a SSA hearing."); Evangelista v. Secretary of Health & Human Servs., 826 F.2d 136, 142 (1st Cir.1987) ("[T]he applicable standard in these 'nonadversarial' proceedings is well below the Sixth Amendment threshold."). As a result, HHS is not obligated to provide counsel for the claimant, *see Lopez,* 728 F.2d at 149, or even to "guarantee the availability of free legal services." *Clark,* 652 F.2d at 403. Rather, the "right to representation" articulated in these cases refers to a claimant's freedom to choose to be represented by counsel in a benefits proceeding.

[100] For DSHS hearings, see WASH. ADMIN. CODE § 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: "Who represents you during the hearing process?

  (1) You may represent yourself or have anyone represent you, except a DSHS employee.

  (2) Your representative may be a friend, relative, community advocate, attorney, or paralegal."

For Employment Security hearings, see WASH. ADMIN. CODE § 192-04-110.

[101] For example, in Washington State, the Administrative Procedures Act provides that "any party may be advised and represented at the party's own expense by counsel or, *if permitted by provision of law, other representative*" (emphasis added). WASH. REV. CODE § 34.05.428(2) (2002). Therefore, unless an agency specifically authorizes the use of non-attorney representatives, it appears that only attorneys can act. Some Washington state agencies do allow for lay representation. *See, e.g.,* DSHS, WASH. ADMIN. CODE § 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 (2003); Employment Security, WASH. ADMIN. CODE § 192-04-110 (2003). Other state agencies, however, essentially only allow for attorney representation. *See, e.g.,* Environmental Hearings Board Forest Practices Hearings, WASH. ADMIN. CODE § 223-08-050 (2003); Pollution Control Hearings, WASH. ADMIN. CODE § 371-08-365 (2003); Shoreline Hearings, WASH. ADMIN. CODE § 461-08-385 (2003).

[102] On the federal level, in Social Security, SSI, and Medicare hearings held before Social Security Administration ALJs, the federal regulations covering these hearings allow for lay representation. *See* 20 C.F.R. §§ 404.1705, 416.1505 (2003).

[103] Goldberg v. Kelly, 397 U.S. 254, 261 (1970) (finding that the due process right includes the right to a fair hearing for public assistance denials, using "brutal needs" to

638   SEATTLE JOURNAL FOR SOCIAL JUSTICE

describe access to food, clothing, shelter, income, and health care). "For qualified recipients, welfare provides the means to obtain essential food, clothing, and medical care. Thus the crucial factor in this context . . . is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy." *Id.* at 264.

[104] Courts agree that attorney representation in the context of establishing eligibility for SSI and Social Security Disability can be critical to obtaining benefits. *See Frank*, 924 F. Supp. at 427–28:

> The potential benefits of having counsel at a benefits proceeding are well recognized. Indeed, the heightened duty placed on the ALJ by this Circuit is an attempt to compensate for the disadvantage of proceeding without counsel. . . . The high rate of remand may well be a function of the fact that, "[u]nder our system of adjudication, no hearing officer (or judge) will ever be an equivalent substitute for a lawyer devoted exclusively to a party's interests. Cases such as the present one will repeatedly arise until the legal services bar translates into action the now commonplace observation that agency cases are usually won or lost at the agency level."

*See also* Guzman v. Califano, 480 F.Supp. 735, 737 (1979).

[105] *See* Joan Grace Ritchey, *Limits on Justice: The United States' Failure to Recognize a Right to Counsel in Civil Litigation*, 79 WASH. U. L.Q. 317, 331–32, 336–38 (2001); Johnson, *New Melody?*, *supra* note 3 at 222–29 (comparing the legal bases for the right to appointment of counsel in European countries with those in the United States).

[106] Ritchey, *supra* note 105, at 318–19.

[107] *Id.* at 323.

[108] 28 U.S.C. § 1915(a) (2004).

[109] *See* Tabron v. Grace, 6 F.3d 147, 153 (3d Cir. 1993); *see also* McKeever v. Israel, 689 F.2d 1315, 1318 (7th Cir. 1982); United States v. McQuade, 579 F.2d 1180, 1181 (9th Cir. 1978).

[110] *Tabron*, 6 F.3d at 155 (stating that "nothing in this clear language [of the statute] suggests that appointment is permissible only in some limited set of circumstances. Nor have we found any indication in the legislative history of the provision to support such a limitation." The court refers to 28 U.S.C. § 1915(d) (2000) "the court may request an attorney to represent any such person unable to afford counsel.")

[111] Whisnant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984); *see also* Franklin v. Murphy, 745 F.2d 1221 (9th Cir. 1984).

[112] *Tabron*, 6 F.3d at 153.

[113] *Id.* at 155.

[114] *Id.* at 156.

[115] *Id.*

[116] Ackridge v. Comm. Dep't of Human Servs., 5 Nat'l Disability Law Rep. ¶ 236 (E.D. Pa. May 5, 1994).

[117] *Id.*

*One Avenue to Appointed Counsel Before a Full Civil Gideon* 639

[118] *Id.*

[119] 42 U.S.C. §§ 2000e–2000e17 (2000).

[120] 42 U.S.C. § 2000e-5(f)(1). *See also* Bindra & Ben-Cohen, *supra* note 83, at 22 (discussing the statute and subsequent case law).

[121] Bindra & Ben-Cohen, *supra* note 83, at 22 (discussing, primarily, Brown v. Continental Can Co., 765 F.2d 810, 814 (9th Cir. 1985)).

[122] *Id.* at 22–23. The authors reason that if a plaintiff proficiently presents the merits of the case, the court will deny counsel because the plaintiff is competent. On the other hand, if the plaintiff inadequately presents the merits, the court will conclude that the case is frivolous and deny counsel. *Id.* While the latter proposition is true, under factor three, the first proposition is not necessarily true. In applying the three-factor test, as articulated in *Brown*, courts do not address the plaintiff's competence. If the plaintiff can show financial need, inability to obtain counsel, and a meritorious case, then the court should appoint counsel in employment discrimination cases regardless of the plaintiff's competence. For cases brought under other statutes or constitutional provisions, however, the authors' point is well-taken, as illustrated in their discussion of Fowler v. Jones, 899 F.2d 1088, 1096 (11th Cir. 1990). In *Fowler*, the Eleventh Circuit applied an exceptional circumstances test in denying a prison inmate appointed counsel in his civil rights suit against prison officials.

[123] Ritchey, *supra* note 105, at 331–32.

[124] *Id.* at 333.

[125] *Id.* at 334–36.

[126] *Id.* at 332.

[127] Johnson, *Toward Equal Justice, supra* note 75, at 218.

[128] Johnson, *New Melody?, supra* note 3, at 223–26.

[129] *Id.* at 223–24.

[130] *See* Lawrence v. Texas, 123 S. Ct. 2472 (2003).

[131] Johnson, *New Melody?, supra* note 3, at 224.

[132] *See* Ritchey, *supra* note 105, at 332 ("the United States is the only major Western nation that does not provide a right to counsel in civil matters," (quoting Earl Johnson, Jr., *The Right to Counsel in Civil Cases: An International Perspective*, 19 LOY. L.A. L. REV. 341, 352–55 (1985))).

[133] *Id.* at 338.

[134] *Id.*

[135] *Id.* But note that some states do provide counsel in similar situations. *See, e.g.,* WASH. R. APP. P. 15.2 (providing the right of appointed counsel for indigents in commitment proceedings under WASH. REV. CODE §§ 71.05, 71.09 (2002) and for dependency and termination of parental rights cases under WASH. REV. CODE § 13.34).

[136] Ritchey, *supra* note 105, at 338.

[137] *Id.*

[138] See CIRCLE manifesto: "The Coalition for Indigent Representation and Civil Legal Equality (CIRCLE) is comprised of individuals who are committed to the principle of equal justice for all as fundamental to the system of justice in the state of Washington." Memorandum from the Coalition for Indigent and Civil Legal Equality (CIRCLE), to all

640   SEATTLE JOURNAL FOR SOCIAL JUSTICE

Equal Justice Legal Service Providers; "CIRCLE Case Identification Information Form"
used to identify potential clients (on file with *Seattle Journal for Social Justice*).
[139] *Frase*, 840 A.2d at 130.
[140] *Id.*